Wiley F. and L'Marie BEAUX,
Appellants/Cross–
Appellees,

v.

Jack and Janet JACOB, Appellees/Cross–
Appellants.

Nos. S–9265, S–9395.

Supreme Court of Alaska.

Sept. 7, 2001.

A. William Saupe, Ashburn & Mason, Anchorage, for Appellants/Cross Appellees.

Ronald L. Baird, Office of Ronald L. Baird, Anchorage, for Appellees/Cross Appellants.

Before FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices. [MATTHEWS, Justice, not participating].

### OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

The superior court awarded damages to purchasers of a home after finding that the sellers violated the Disclosures in Residential Real Property Transfers Act. We hold that it did not clearly err in so finding and that it implicitly addressed the sellers' allegations of comparative fault and failure to mitigate damages. But largely because the damages awarded exceeded the cost of putting the home in the condition the disclosure form represented, we reverse the damage award and remand for further proceedings. We also remand because prejudgment interest must be recalculated to distinguish between damages for economic loss and damages for harm to property.

## II. FACTS AND PROCEEDINGS

In 1976 Wiley Beaux, a licensed engineer and real estate developer, subdivided a parcel of real property on the north shore of Campbell Lake in Anchorage. Beaux selected the lot at 3300 North Shore Drive for his family home. Construction began in 1976, with Beaux serving as the general contractor.

The original design called for a one-floor, ranch-style home with a crawl space, but Beaux decided to build a full basement beneath the first floor. Because excavation of the lot extended several feet below the lake level, groundwater was a concern.

To control the groundwater underneath the basement slab, Beaux installed a sump in the basement mechanical room. The sump was equipped with an automatic pump activated by a flotation device, and was connected by a permanent outlet to the municipal sewer system. The Beauxs refer to this arrangement as the "main sump."

During construction, Wiley Beaux also installed a vertical eight-inch diameter corrugated aluminum pipe extending four feet below the basement concrete slab. This pipe was originally designed to aid in the installation of a jacuzzi pool. But after the pool was installed, Beaux decided to leave the pipe in place.

The Beauxs resided in the house from 1978 until 1994. They controlled the groundwater level under the house by using both the main sump in the mechanical room and a portable pump to drain water out of the eight-inch pipe in the pool room. The Beauxs called the latter arrangement the "deep sump." They did not experience any groundwater infiltration in the basement.

In February 1994 Wiley and L'Marie Beaux listed the house for sale. Soon thereafter, Jack and Janet Jacob visited the house for a preliminary view. After a series of offers and counteroffers, the parties executed an earnest money agreement for the sale of the house on March 23, 1994.

Before the sale, the Beauxs gave the Jacobs a real property transfer disclosure form as required by AS 34.70.010 of the Disclosures in Residential Real Property Transfers Act.[1] A question on the disclosure form asked: "Is there any indication of water/seepage/dampness in basement/crawl space? If yes, explain." In response, the Beauxs checked "NO," but also wrote by hand that "Sump Pumps must be maintained and used." (Emphasis added.)

After the Jacobs moved in, they used the automatic sump pump in the mechanical room to control the water table under the basement; they did not use the eight-inch pipe in the pool room as a sump.

In 1995 the Jacobs experienced three episodes of water infiltration in the basement. On each occasion the basement carpet was soaked.

In August 1995 the Jacobs hired Greg Carpenter, a geotechnical engineer, to review the water infiltration problem. Carpenter opined that precipitation and the proximity of the house to Campbell Lake caused the water table to rise to (or above) the level of the basement slab, resulting in water infiltration. Carpenter concluded that a perimeter drain system would control the water infiltration.

In August 1996 the Jacobs hired a contractor to install an exterior perimeter drain system. The Jacobs also installed new carpet in the basement.

In March 1997 the Jacobs sued the Beauxs, alleging misrepresentation, failure to disclose, and violation of the Disclosures in Residential Real Property Transfers Act. After a bench trial, the superior court found that the Beauxs had negligently failed to inform the Jacobs of the use of the deep sump for removal of groundwater. On September 24, 1999 the superior court entered a judgment of $56,393.88 against the Beauxs. The judgment included $8,126.63 of prejudgment interest from January 12, 1997, when the Beauxs received written notification of the Jacobs' claims, and an Alaska Civil Rule 82(b)(1) attorney's fees award of $7,116.89. The Beauxs appeal, and the Jacobs cross-appeal.

## III. DISCUSSION

### A. The Superior Court Did Not Clearly Err in Finding that the Beauxs Failed to Use the Degree of Reasonable Care that a Reasonably Prudent Person Would Have Used in Answering the Disclosure Form's Questions.

 The superior court found by a preponderance of the evidence that the Beauxs had negligently failed to inform the Jacobs of the use of the deep sump to control the groundwater beneath the basement slab.

---

1. AS 34.70.010–.200. AS 34.70.010 provides: "Before the transferee of an interest in residential real property makes a written offer, the transferor shall deliver ... a completed written disclosure statement...."

The superior court found that the Beauxs' statement in the disclosure form that "Sump Pumps must be maintained and used," without more elaboration, was ambiguous, and subject to a reasonable interpretation that the term "sump pumps" referred only to the permanently installed automatic sump pump in the mechanical room. The superior court therefore concluded that the Beauxs had "failed to use that degree of reasonable care that a reasonably prudent person would have used in responding in good faith to some of the questions in the Real Property Transfer Disclosure Form."

The Beauxs contend on appeal that the superior court clearly erred in finding that the statement "Sump Pumps must be maintained and used" was ambiguous and was subject to a reasonable interpretation that the term "sump pumps" referred only to the permanent sump in the mechanical room. They argue that the plural "pumps" cannot reasonably be interpreted to refer to a single pump. The Beauxs further argue that while they may have used the term "sump pump" in an unconventional sense when referring to the deep sump, the Jacobs' actual knowledge of the deep sump and its utility in controlling the groundwater eliminated any ambiguity in their statement. The Beauxs note that they showed the Jacobs the deep sump and explained to them how to use it. The Beauxs also note that they gave the Jacobs a written instruction sheet which, they argue, explained that the deep sump was effective at lowering the level of the groundwater underneath the basement. The Beauxs further note that the Jacobs admitted at trial (1) that they knew about the deep sump; (2) that they had read and understood the written pool instructions; and (3) that they knew how to work the deep sump. Finally, the Beauxs argue that further elaboration was unnecessary because the Jacobs were sophisticated buyers—he is a medical doctor and she is a registered nurse—who were familiar with the use of sump pumps because they had previously lived on the shore of Campbell Lake in a house that had three sump pumps.

We review a trial court's finding of negligence under the clearly erroneous standard,[2] and we reverse only if we are left with the definite and firm conviction, on the entire record, that a mistake has been made.[3]

The record contains substantial evidence supporting the superior court's finding that the Beauxs' disclosure was ambiguous. The Jacobs correctly argue that while an engineer might broadly describe the pipe in the pool room as a sump, an average home purchaser would regard only the installation in the mechanical room as a sump for home use. Greg Carpenter, the geotechnical engineer the Jacobs hired to review the water infiltration in the basement, testified that "sump pump" usually refers to a permanent installation, such as the one found in the mechanical room. The professional inspector who inspected the house before the sale also used the term "sump pump" to refer only to the permanent installation in the mechanical room. Moreover, the Beauxs' argument that the written pool instructions should have alerted the Jacobs to the deep sump's utility in controlling the groundwater level is not well taken. The instructions imply that the deep sump should be used only "[i]f pool is to be left empty for some time." The instructions do not disclose the need to use the deep sump to avoid water infiltration in the basement. We therefore affirm the superior court's finding of negligence.

B. *The Findings Adequately Addressed Comparative Fault.*

The Beauxs next argue that the trial court erred in failing to make fact findings regarding the Jacobs' comparative fault. The Beauxs contend that the trial court should have apportioned fault to the Jacobs under the principle of comparative negligence for:

(1) their failure to read and think about the clearly disclosed need to "maintain and use" both sump pumps; (2) their unex-

**2.** See State v. Guinn, 555 P.2d 530, 534–35 (Alaska 1976); Graham v. Rockman, 504 P.2d 1351, 1353 (Alaska 1972).

**3.** See Hildebrandt v. City of Fairbanks, 863 P.2d 240, 243 n. 4 (Alaska 1993).

plained failure to connect the disclosure statement to their direct knowledge of the second pump; (3) their failure to mention the second pump and pool room sump to the engineers; (4) their unexplained failure to use the second pump sooner[; and (5) their failure] to call the Beauxs for advice.[4]

■ The superior court's fact findings implicitly addressed each of the Beauxs' allegations of comparative fault.[5] The superior court found that the Beauxs' disclosure that "sump pumps must be maintained and used" was ambiguous, and was subject to a reasonable interpretation that the term "sump pumps" referred only to the permanent sump in the mechanical room. The superior court also found that the Beauxs did not fully inform the Jacobs "of the inadequacy of the permanent sump in the boiler room to keep the water table at a safe level." Finally, the superior court found that the Beauxs did not fully inform the Jacobs of the need to use the deep sump to prevent water infiltration into the basement.

These findings, read together, suggest that the superior court found that the Jacobs reasonably interpreted the disclosure statement, and necessarily imply that the superior court found that the Jacobs "read and [thought] about" the disclosures. The findings are also inconsistent with finding that the Jacobs negligently failed "to connect the disclosure statement to their direct knowledge of the second pump." And the finding that the Jacobs were not informed of the need to use the deep sump to prevent water infiltration in the basement precludes a find-

ing that they were negligent in failing to mention the deep sump to the engineers, or in failing to use the deep sump sooner. Because the superior court implicitly addressed each of the Beauxs' allegations of comparative fault, and because its findings were not clearly erroneous,[6] we need not remand for further fact findings.

### C. *The Court Did Not Err Regarding Mitigation of Damages.*

■■ The Beauxs assert that the superior court erred by failing to find that the Jacobs breached their duty to mitigate their damages.[7] We perceive no error.

■ The Beauxs first argue that the Jacobs could have mitigated their damages by contacting the Beauxs after the first water infiltration episode to inquire about its cause and how it could have been prevented. But as commentator Dan Dobbs notes, "Sometimes minimizing rules should not be applied because the risk seems too high that the defendant will repeat misconduct if he [or she] gets the benefit of the minimizing rules. A defense must not routinely operate to negate duties already imposed."[8] Similarly, Restatement (Second) of Torts § 918, comment i, provides: "[I]f the original act [of the tortfeasor] was intentionally wrongful or negligent, it may not be unreasonable for a person to decline to trust ... the good will or skill of the tortfeasor."[9] Given the superior court's finding that the Beauxs had previously negligently failed to disclose the need to use the deep sump to prevent water infiltra-

4. The Beauxs also argue that the Jacobs were comparatively negligent because they installed a perimeter drain system to remedy the water infiltration problem, rather than a less expensive permanent pump in the deep sump. This argument is most relevant to the issue of damages and we therefore consider it in Part III.D.

5. Whether particular conduct is negligent is a question of fact normally reserved for the trier of fact. *See Schumacher v. City and Borough of Yakutat*, 946 P.2d 1255, 1256 n. 1 (Alaska 1997).

6. *See supra* Part III.A.

7. The Beauxs argue that because "[a] remand would achieve nothing but added expense," we should hold as a matter of law based on the record "that the Jacobs' failure to mitigate excuses the Beauxs from paying any damages in ex-

cess of the ... cost of purchasing and installing" a permanent pump in the deep sump. The reasonableness of a plaintiff's effort to mitigate damages is normally a question for the trier of fact. *See Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991). Therefore, if we were to accept the Beauxs' argument that the superior court erred in failing to make fact findings regarding the Jacobs' duty to mitigate damages, we would remand to allow the superior court to make the appropriate findings.

8. 1 Dan B. Dobbs, *Law of Remedies* § 3.9, at 385 (2d ed.1993).

9. Restatement (Second) of Torts § 918 cmt. i (1977).

tion,[10] we conclude that the superior court was not obliged to find that the Jacobs' failure to contact the Beauxs was a failure to mitigate.

▮ The Beauxs next argue that the Jacobs could have mitigated their damages by using the deep sump to prevent flooding long before they actually began to do so in August 1995. But this argument is precluded by the superior court's implicit finding that the Jacobs reasonably interpreted the disclosure statement to refer only to the permanent sump pump in the mechanical room.[11]

▮ Finally, the Beauxs contend that the Jacobs should have installed a permanent, automatic pump in the pool room for approximately $1,500, rather than the perimeter drain system. This argument raises the question of the proper measure of damages and we consider it in Part III.D.

### D. *The Damages Award Requires Remand.*

#### 1. *The perimeter drain system*

▮ The damages award included $22,192.86 for installing the perimeter drain system. The Beauxs argue that the Jacobs cannot recover the cost of installing the drain system because a permanent pump installed in the deep sump would have sufficiently remedied any wrong.

▮ A trial court's determination of damages is a finding of fact which we affirm unless it is clearly erroneous.[12] But we ap-

ply our independent judgment in deciding whether the trial court's award of damages is based on an erroneous application of law.[13]

▮ Alaska Statute 34.70.090(b) provides that a person who makes a negligent disclosure under AS 34.70 is liable for "actual damages" suffered because of the negligent disclosure. "Actual damages" is synonymous with "compensatory damages."[14] The general principle underlying the assessment of compensatory damages in tort cases is that "an injured person is entitled to be replaced as nearly as possible in the position he [or she] would have occupied had it not been for the defendant's tort."[15] In negligent nondisclosure cases, an appropriate measure of damages is the "cost of putting the property in the condition that would bring it into conformity with the value of the property as it was represented."[16]

The Beauxs represented to the Jacobs that the house had a sump pump system that would keep the basement dry. They did not represent that the house had a perimeter drain system, and the Jacobs did not expect to purchase a house with a perimeter drain system. Thus, it was error to award damages measured by the cost of a perimeter drain system, given the superior court's finding that using both pumps had prevented water infiltration in the basement in the sixteen years the Beauxs had occupied the house, and given the absence of any finding that a perimeter drain system was needed to remedy the Beauxs' nondisclosure. The su-

---

10. The superior court found that the Beauxs' failure to disclose the need to use the deep sump to prevent water infiltration in the basement was not intentional.

11. *See supra* Part III.B.

12. *See Curt's Trucking Co. v. City of Anchorage,* 578 P.2d 975, 977 (Alaska 1978).

13. *See id.*

14. *See Black's Law Dictionary* 394 (7th ed.1999); *McMillian v. Federal Deposit Ins. Corp.,* 81 F.3d 1041, 1055 (11th Cir.1996); *Saunders v. Taylor,* 42 Cal.App.4th 1538, 50 Cal.Rptr.2d 395, 398 (1996).

15. *Beaulieu v. Elliott,* 434 P.2d 665, 670–71 (Alaska 1967); *see also Luth v. Rogers & Babler Constr. Co.,* 507 P.2d 761, 766 (Alaska 1973) ("A

cardinal common law principle establishes that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered.").

16. *Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399, 401 (1964); *see also* 37 Am.Jur.2d *Fraud and Deceit* § 357 (1968) (stating that in misrepresentation actions, "the courts have recognized the propriety of allowing, as damages, the cost of changing the property so as to make it conform to the condition which was represented to exist"); *Breck v. Moore,* 910 P.2d 599, 608 (Alaska 1996) (holding that purchasers of real property were entitled to receive "the property as they expected to receive it," as damages for attorney's malpractice that left cloud on their title).

perior court should have awarded the Jacobs the cost of installing a functional sump pump system, i.e., installing a permanent pump in the deep sump.[17]

In defending the award, the Jacobs refer us to Greg Carpenter's testimony that a permanent pump in the deep sump could not be said with assurance to lower the water table at the perimeter of the foundation of the house. But the cited testimony is Carpenter's evaluation of the adequacy of the mechanical room sump for controlling the groundwater level. He also testified that if it was used diligently, the deep sump would prevent water infiltration. And the trial court's finding that using both sumps had prevented infiltration while the Beauxs occupied the house necessarily forecloses affirming by relying on the Carpenter testimony. Concluding that it was legal error to select the wrong measure of damages, we reverse this part of the damages award and remand for further proceedings.

### 2. The basement carpet

■ The damages award also included $7,918.70 for the cost of replacing the basement carpet. The Beauxs argue on appeal that the superior court's award is clearly erroneous, because (1) their conduct did not proximately cause the harm to the carpet; and (2) the Jacobs are not entitled to recover the full cost of replacing the depreciated basement carpet with "brand new, more expensive Karastan carpet."

The Beauxs first argue that they were not responsible for the critical damage to the basement carpet. They observe that an insurance adjuster testified that the recreation room carpet was reusable when he inspected it in August 1995, after the last infiltration episode that can be causally linked to the Beauxs' disclosures. The Beauxs claim that

the basement carpet was damaged when an unidentified person accidentally opened the valve of an abandoned water line in the house in October 1995, and when a sewer backup occurred soon thereafter. The Beauxs note that Jack Jacob testified that the sewer backup was "kind of the final event" for the carpet.

The superior court found that the damage directly associated with the final two episodes of flooding in the basement was minimal, and that "the damage to the basement floor covering had already been done by the three previous water incursions." The superior court's finding is not clearly erroneous. It is supported by substantial evidence that replacement of the basement carpet was necessary even before the final two episodes of water infiltration, because the carpet was moldy.

■ The Beauxs next argue that it was error to award the full cost of installing new Karastan carpet in the basement. The Beauxs argue that the superior court's award unjustly enriched the Jacobs by exceeding the value of the carpet that was damaged. The Beauxs claim that the Jacobs should have recovered only the depreciated value of the basement carpet at the time the house was sold.[18]

Even though the damages award exceeded the depreciated value of the basement carpet when the house was sold, we reject the Beauxs' assertion that the Jacobs were limited to the depreciated value of the carpet. Awarding the full cost of replacing depreciated carpet with new carpet confers a windfall upon the Jacobs.[19] But we noted above the general principle that "an injured person is entitled to be replaced as nearly as possible in the position he [or she] would have occupied had it not been for the defendant's

---

17. The Beauxs assert that there is evidence that the installation of a second, permanent sump pump would have cost a maximum of $1,500.

18. The Beauxs note that when they sold the house, the basement bedroom carpet was sixteen years old and had depreciated between fifty and seventy-five percent; the recreation room carpet was five years old and had depreciated between ten and fifty percent.

19. See 1 Dobbs, supra note 8, § 5.2(7), at 734 ("Some repairs to land or structures will provide the owner with property more valuable than it was before the injury. For example, if the plaintiff's roof is 15 years old, and, when new, had a normal expected life of 20 years, replacement of the damage may give the plaintiff an effectively new roof with a 20 year expected life. If the plaintiff recovers the full costs of this new roof, he will certainly have a windfall.").

tort."[20] Absent evidence of a market source for used carpet of similar useful life, the Jacobs could only be made whole if they recovered the cost of installing new carpet.

■ Nonetheless, the Jacobs were entitled to recover only the cost of replacing the damaged carpet with carpet of like original quality. The appellate record does not clearly establish whether the Karastan carpet was of quality similar to the original quality of the replaced carpet. We therefore remand for findings on the comparative values of the new carpet and the old carpet in its original condition.

### E. It Was Not Error to Award the Jacobs Partial Attorney's Fees under Civil Rule 82(b)(1).

■ The superior court awarded the Jacobs partial attorney's fees of $7,116.89 under Alaska Civil Rule 82(b)(1). The Jacobs had moved for an award of reasonable, actual attorney's fees of $41,895 in reliance on the terms of the earnest money agreement, which provides that "[i]n any action, proceeding or arbitration arising out of this agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs." The superior court granted only partial fees because it ruled that the Jacobs' claims "did not arise out of the earnest money agreement," but were tort and statutory, rather than contract, causes of action. The Jacobs argue in their cross-appeal that they were entitled to reasonable actual attorney's fees.

■ Interpretation of an attorney's fees clause in a contract is a question of law which we review de novo.[21]

In *Sullivan v. Subramanian*,[22] we held that a lawsuit plaintiffs filed against their former landlord, alleging breach of contract, retaliatory eviction, failure to return security deposits, and violation of the Uniform Residential Landlord and Tenant Act,[23] arose out of the statute for purposes of an attorney's fees award.[24]

Similarly, Arizona courts have held that a contractual provision for attorney's fees entitling the prevailing party in an action "arising out of" the contract to an award of attorney's fees does not apply when a plaintiff sues under a statutory cause of action.[25] In *Kennedy v. Linda Brock Automotive Plaza, Inc.*, the plaintiff, who had leased a car from the defendant, sued the defendant under the Arizona "Lemon Law."[26] The Arizona Court of Appeals held that the plaintiff's cause of action did not "arise out of … contract" because it was purely statutory, although the court "recognize[d] that a claim for relief under the 'Lemon Law' presupposes an express contract."[27]

The Jacobs alleged only tort and statutory causes of action—misrepresentation, failure to disclose, and violation of AS 34.70—and did not allege a breach of contract or request contract remedies. We therefore hold that the Jacobs' claims did not "arise out of" the earnest money agreement and consequently affirm the superior court's award of partial attorney's fees under Rule 82.[28]

### F. Prejudgment Interest Must Be Recalculated.

■ The Jacobs argue in their cross-appeal that they were entitled to additional

20. *Beaulieu*, 434 P.2d at 670–71.

21. See *Johnson v. Olympic Liquidating Trust*, 953 P.2d 494, 497 (Alaska 1998); *Jackson v. Barbero*, 776 P.2d 786, 788 (Alaska 1989).

22. 2 P.3d 66 (Alaska 2000).

23. AS 34.03.010–.380.

24. See *Sullivan*, 2 P.3d at 73.

25. See, e.g., *Kennedy v. Linda Brock Automotive Plaza, Inc.*, 175 Ariz. 323, 856 P.2d 1201, 1203 (App.1993); *O'Keefe v. Grenke*, 170 Ariz. 460, 825 P.2d 985, 997–98 (App.1992).

26. *Kennedy*, 856 P.2d at 1202.

27. *Id.* at 1203–04.

28. AS 34.70.090(d) provides: "In addition to the damages allowed under … this section, a court may also award the transferee costs and attorney fees to the extent allowed under the rules of court." Although Rule 82(b) contemplates an award of partial attorney's fees, Rule 82(a) expressly permits awards as "provided by law or agreed to by the parties." Because no statute or contract term applicable to the Jacobs' claims required an award of full reasonable fees, Rule 82(b) controls.

pre-judgment interest. The judgment included prejudgment interest from January 12, 1997, when the Beauxs received written notification of the Jacobs' claims.[29] The Beauxs contend that under AS 09.30.070(b)[30] the superior court correctly treated prejudgment interest as accruing from the date they received written notice of the Jacobs' claims.

The Jacobs argue that AS 09.30.070(b) applies only to claims for "personal injury, death, or damage to property."[31] Because, the Jacobs argue, their claims were for purely economic loss, prejudgment interest should have accrued from March 23, 1994, when the parties executed the earnest money agreement and the Jacobs' cause of action accrued.

 When prejudgment interest begins to accrue is a question of law which we review applying our independent judgment.[32] We review interpretations of statutes de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[33]

In several recent cases we have suggested, but not held, that AS 09.30.070(b) applies only to actions for personal injury, death, or damage to property.[34] In *Henash v. Ipalook*,

we observed that AS 09.30.070(b) "might only apply to actions for 'personal injury, death, or damage to property.' "[35] But because the issue was inadequately briefed, we directed the superior court in that case to determine on remand whether AS 09.30.070(b) applied to the plaintiff's claim under the Alaska Wage and Hour Act.[36] Similarly, in *Johnson v. Olympic Liquidating Trust*, we questioned whether AS 09.30.070(b) applied to the plaintiff's contract claim, noting that the statute might apply only "to cases involving 'personal injury, death, or damage to property.' "[37] But because the parties had assumed that the statute applied, and because we did not need to decide the issue to resolve the case, we declined to reach the issue.[38] And in *McConkey v. Hart*, we stated that AS 09.30.070(b) modifies the general rule of awarding prejudgment interest from the accrual date of a cause of action by providing that "the starting date for prejudgment interest *on certain tort judgments* shall be the date on which the defendant receives written notice that a claim may be brought, or the date on which process is served, whichever is earlier."[39]

 We now explicitly hold that AS 09.30.070(b) applies only to actions for per-

**29.** The July 7, 1999 judgment awarded prejudgment interest beginning January 12, 1997, when the Beauxs received written notification of the Jacobs' claims. The Jacobs moved to amend the judgment, seeking prejudgment interest from March 23, 1994. The superior court denied the Jacobs' motion. But the September 24, 1999 amended judgment awarded prejudgment interest from "June 12, 1997, the date of the demand." It appears that the amended judgment erroneously substituted "June" for "January."

**30.** Before its amendment effective January 1, 2000, AS 09.30.070(b) provided:

> Except when the court finds that the parties have agreed otherwise, prejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier. The written notification must be of a nature that would lead a prudent person to believe that a claim will be made against the person receiving notification, for *personal injury, death, or damage to property.*
> (Emphasis added.)

**31.** AS 09.30.070(b).

**32.** *See Johnson*, 953 P.2d at 497; *Tookalook Sales & Serv. v. McGahan*, 846 P.2d 127, 129 (Alaska 1993).

**33.** *See Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000).

**34.** *See Henash v. Ipalook*, 985 P.2d 442, 450–51 (Alaska 1999); *Johnson*, 953 P.2d at 499 n. 4.

**35.** *Henash*, 985 P.2d at 451 (citations omitted).

**36.** *See id.*

**37.** *Johnson*, 953 P.2d at 499 n. 4 (citations omitted).

**38.** *See id.*

**39.** *McConkey v. Hart*, 930 P.2d 402, 404–05 (Alaska 1996) (emphasis added); *see also Hofmann v. von Wirth*, 907 P.2d 454, 455 n. 2 (Alaska 1995) (noting that AS 09.30.070 "encompass[es] personal injury, death, and property damage cases"); *but see Alaska Hous. Fin. Corp. v. Salvucci*, 950 P.2d 1116, 1126–27 (Alaska 1997) (applying without discussion AS 09.30.070(b) to Alaska Whistleblower Act claim).

sonal injury, death, or damage to property, and does not apply to claims for purely economic loss. This approach is consistent with our recent decision in *Cole v. Bartels.*[40] In that case, purchasers of a home sued the defendant for failing to disclose wall decay, in violation of the Disclosures in Residential Real Property Transfers Act.[41] A jury found for the plaintiffs, and the judgment included prejudgment interest from the date the plaintiffs' claim accrued.[42] On appeal, we affirmed the prejudgment interest award.[43] In affirming, we rejected the defendant's argument that an award of prejudgment interest on unexpended repair costs—the purchasers had not yet repaired the undisclosed defect at the time of trial—constituted an improper double recovery.[44] The *Cole* parties did not cite AS 09.30.070(b), and we did not discuss whether the statute applied to the purchasers' claim. Nevertheless, affirming the superior court's prejudgment interest award, which awarded prejudgment interest from the date when the purchasers' claim accrued, was consistent with reading AS 09.30.070(b) to be inapplicable to a nondisclosure claim for purely economic loss.[45]

 A plaintiff's claim is for purely economic loss if the plaintiff has suffered only "damage based on insufficient product value."[46] For example, where a plaintiff seeks to recover "loss of bargain" damages— i.e., the difference in value of what is received and its value as represented—the claim is for purely economic loss.[47]

The Jacobs sought awards both for economic loss—i.e., "loss of bargain" damages caused by the negligent disclosures—and for property damage caused by the Beauxs' negligence—i.e., damages for the cost of replacing the basement carpet, which was damaged by water infiltration. On remand, the superior court should apply AS 09.30.070(b) only to the Jacobs' claims for "damage to property."

## IV. CONCLUSION

For these reasons, we AFFIRM with respect to the issues of liability, comparative fault, and mitigation of damages, but REVERSE the damage award and REMAND for further proceedings consistent with this opinion, including recalculation of the prejudgment interest award. And although we AFFIRM the methodology by which the superior court calculated attorney's fees, changes in the awards for damages and prejudgment interest will require that the attorney's fees be recalculated.

**40.** 4 P.3d 956, 958 (Alaska 2000).

**41.** *See id.*

**42.** *See id.*

**43.** *See id.*

**44.** *See id.* at 958–59.

**45.** *See id.* If AS 09.30.070(b) had applied to the purchasers' claim in that case, they would have been entitled to prejudgment interest only from the date when the defendant received written notice that a claim might be brought, or the date on which process was served, whichever was earlier.

**46.** *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279, 290 (Alaska 1976) (citation omitted).

**47.** *See id.*